1      UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF ALASKA

2

3   UNITED STATES OF AMERICA,        )
                                     )
4            Plaintiff,              )
                                     )
5        vs.                         ) CASE NO. 1:23-cr-00003-TMB
                                     )
6   CRISTOBAL MAGNO RODRIGO,         )
                                     )
7            Defendant.              )
    _____ )

8

9           TRANSCRIPT OF IMPOSITION OF SENTENCE
      **BEFORE THE HONORABLE TIMOTHY M. BURGESS, DISTRICT JUDGE**
10            Monday - August 28, 2023
              8:14 a.m. - 10:15 a.m.
11                 Juneau, Alaska

12  **FOR THE GOVERNMENT:**
         Office of the United States Attorney
13       BY:  JACK S. SCHMIDT
         709 West 9th Street, Room 937
14       Juneau, Alaska 99801
         (907) 796-0402

15

16  **FOR THE DEFENDANT:**
         Newton and Hall
17       BY:  BRADLEY G. BARSHIS
         610 Central Avenue South
18       Kent, Washington 98032
         (253) 852-6600

19

20
    Probation Officer: Eva Barbee

21
    _____
22                    **SONJA L. REEVES**
                 **Registered Diplomate Reporter**
23                **Certified Realtime Reporter**
                 **Federal Official Court Reporter**
24              222 West 7th Avenue, #4
                 Anchorage, Alaska 99513
25       Transcript Produced from the Stenographic Record

1                    (Call to Order of the Court at 8:14 a.m.)

2            DEPUTY CLERK:  All rise.  His Honor, the Court, the

3    United States District Court for the District of Alaska is now

4    in session, the Honorable Timothy M. Burgess presiding.

5            Please be seated.

6            Your Honor, we're on record in Case No.

7    1:23-criminal-3-1, *United States of America versus Cristobal*

8    *Magno Rodrigo.*

9            Counsel, please state your appearance for the record.

10           MR. SCHMIDT:  Jack Schmidt for the United States here

11   with Special Agent Matt Sherrell.

12           MR. BARSHIS:  Bradley Barshis on behalf of

13   Mr. Rodrigo, who is present to my left.

14           THE COURT:  Good morning, everybody.  This is the time

15   set for the imposition of sentence.  I have a number of

16   questions about the case, any agreement that you all have

17   crafted in this case.

18           And just to remove any surprises, I'm not inclined to

19   accept the plea agreements in this case.  I don't feel that

20   it's appropriate for the Court's hands to be tied like this.  I

21   don't agree with the proposed dispositions that have been

22   negotiated in this case, but I'll obviously give you a chance

23   to argue why I should.

24           But under the terms of the plea agreements entered in

25   this case, as I understand it broadly, the only person who is

looking at any jail time is the defendant present here in the courtroom.  His wife is looking at a probationary sentence, which I think is inappropriate considering her role in this offense.  Their young son, who is now an adult, maybe -- it may be the parties' argument that he not do jail time because his parents got him involved in this is appropriate, but I still think there needs to be more consequences to him as a result of what he did.

I'm concerned about the, what I consider, mysterious numbers in this case.  The government says that this case involved over a million dollars in loss for purposes of the sentencing guidelines and their activities, yet the fine doesn't -- the fine and restitution don't come anywhere close to that, so I need -- I'm going to need answers to those questions.

I'm concerned that only $10,000 is going to go to the Indian Arts Fund administered by the Department of Interior. I'm concerned about that, because the affected Native community is the Alaska Native community, and I think that money should be going back to Alaska Native artists, not to a pot in Washington, DC that gets distributed around the country, unless there is a way that that can be targeted to come back to Alaskan artists.

I have other concerns, but I wanted to highlight some of them for you.  I'm happy to hear -- and I know you have

1    indicated you have individuals who have come from Washington,

2    DC, so I'm certainly happy to have them go on the stand and we

3    can create a record with whatever testimony you want to elicit

4    from them so they don't have to make a return trip here, but I

5    will have to tell you, in reviewing the conduct in this case,

6    the breadth and the scope of the misconduct that went on --

7    and, again, I think what's been identified as the victims in

8    this case is probably not broad enough because there has now

9    been deep distrust created for those who want to buy this type

10   of art, not knowing if it's real or not real, which has an

11   impact on Alaska Native artists.

12        There is the competing stores that sold actual Alaska

13   Native art who lost out because of the defendants' conduct in

14   this case.  This was an elaborate, well thought out,

15   international conspiracy to rip people off.

16        And I just -- as I read this file today, I am not

17   willing to have my hands tied as to what sentences I mete out

18   to defendants in this case.  So that's my opening statement.

19   I'm happy to hear from the parties.

20        MR. SCHMIDT:  Well, first thing I would point out to

21   the Court that we had a defendant by the name of Mr. Bulgan

22   that was before the Court.  I had negotiated a fine in that

23   particular case, and he had a probationary sentence that was

24   agreed upon, and this Court basically gave him a probationary

25   sentence with a donation to the ICAB.

1          They had basically the same type of conduct.  We

2    weren't able to prove as much fraud as we had in this

3    particular case; however, based on that and the defendant's

4    willingness to come in and accept responsibility and basically

5    negotiated with us a resolution to this particular sentence.

6          THE COURT:  If I made a mistake in that case, it

7    doesn't mean I'm going to make a mistake in this case.

8          MR. SCHMIDT:  In looking at the guidelines, we looked

9    at the guideline fines between $10,000 and $95,000.  We did a

10   midline guideline sentence on that.

11         THE COURT:  If I read the PSR though, they are

12   essentially paupers, they don't have any money to pay a fine.

13   And in fact, I think the probation office, if I remember

14   correctly, suggested that they not be ordered a fine because

15   they don't have any money.

16         MR. SCHMIDT:  Well, they have created businesses.  I'm

17   sure that they will get back and earn funds.  They have some

18   skills.  And Ms. Rodrigo has been successful in the past with

19   other types of businesses.

20         THE COURT:  Ms. Rodrigo states that she was unemployed

21   in 2021, when in fact she -- what she says is she hasn't been

22   employed since 2020, when in fact the PSR, unobjected to, the

23   PSR says that in 2021, she and her husband were shilling fake

24   art to tourists.  Well, she was making money then.

25         MR. SCHMIDT:  The shilling was done by Mr. Rodrigo.

1        THE COURT:  That's not what the PSR says.

2        MR. SCHMIDT:  She was the one that was doing the books

3   and running the business and doing all the other stuff.  She

4   wasn't doing any of the actual sales.

5        THE COURT:  Well, maybe I'm misremembering, but I

6   thought I read in the PSR that she, and it might have been her

7   son, but it may have been her husband, actually negotiated at

8   least two sales in July of 2021, but let me -- let's just go to

9   the PSR.  I don't want to misspeak.

10        Paragraph 23, "On July 12, 2021, Cristobal and Glenda

11   sold a Philippine-produced stone carving of a bear and a salmon

12   signed by Kilit for $1,000, and they gifted the buyer a small

13   standing stone carving of an eagle signed by Junior.  Cristobal

14   represented the carvers of both carvings as Alaska Native

15   artists."

16        July 15, three days later, at that store, "She also

17   participated in selling a signed salmon carved by Kilit for

18   $1,600."

19        This is all at the time when she is telling probation

20   that she was unemployed, she didn't have any job, yet she's out

21   here committing this crime, making money.  So you understand

22   why I'm troubled, I hope.

23        MR. SCHMIDT:  I certainly can see that, Your Honor.

24   And as for paragraph 23, she was in the store at the time, and

25   this has been charged as a conspiracy, but the --

1          THE COURT:  This was a conspiracy by proximity?

2          MR. SCHMIDT:  By her assistance of the business and --

3          THE COURT:  That is not what the PSR says, and neither

4    one of you, neither the defense nor the government objected to

5    the representation that she was involved in those two sales,

6    when she also tells probation, "Oh, by the way, I was

7    unemployed."

8          So you're telling me she was keeping the books for

9    this conspiracy in 2021, yet she says she's unemployed?

10         MR. SCHMIDT:  That -- I would not say that that is

11   factually incorrect, that she was saying that she was

12   unemployed at the time.  She was employed running the

13   businesses during that time in 2021.

14         THE COURT:  That's not what's been represented.  So

15   look, we can get down in the weeds and argue all of these

16   points.  Everybody has taken the time to come here today.  I

17   want to give you the opportunity to make whatever pitch you

18   want to make as to why my concerns are inaccurate and that I

19   should accept this deal and we can move forward, but I'm

20   telling you it's not only the defendant before me right now

21   that I'm concerned about, I'm concerned about the other two

22   defendants.

23         And my reading of the totality of the facts in this

24   case is that it leaves me with the impression I'm not inclined

25   to accept a (C) agreement where my hands are tied and I have to

1    accept the resolution brokered by the parties in this case.

2            And if we have to have a trial, we have a trial.

3    That's why we have courthouses.  So the other part of this is I

4    know you brought people in from out of state.  I'm happy if you

5    want to put them on to make the record with them so they don't

6    have to travel back again, because then we'll have that

7    information.

8            So do you all need a moment to talk, you and defense

9    counsel?

10           MR. SCHMIDT:  It would be appreciated.

11           THE COURT:  Because I know I have pulled the

12   tablecloth out from under all the China and you probably need a

13   few minutes to the talk.  So I'll go back here and tell me when

14   you're ready to go forward.

15           DEPUTY CLERK:  All rise.  This court stands in a brief

16   recess.

17      (Recessed from 8:25 a.m. to 8:41 a.m.)

18           DEPUTY CLERK:  All rise.  His Honor, the Court, the

19   United States District Court is again in session.

20           THE COURT:  Do we know where the defendant is?

21           DEPUTY CLERK:  He just stepped out.  He's walking back

22   in.  My apologies.

23           Please be seated.

24           THE COURT:  You don't have to apologize.

25           How are we doing?

1    MR. BARSHIS:  Your Honor, I was trying to speak with

2 my client in the hallway to discuss what the government and I

3 just discussed, and then was called back in here, so I haven't

4 had an opportunity to discuss it with my client.

5    THE COURT:  I'm not trying to get into the middle of

6 your negotiations, but I need to know if we're going forward

7 today or not.

8    MR. BARSHIS:  I believe we're attempting to.

9    MR. SCHMIDT:  We made an adjustment to the plea

10 agreement and he's got to discuss that with his client.

11    THE COURT:  He has three clients in this case.  And as

12 I indicated, my problem isn't only with the plea agreement for

13 this defendant; my problem is with the plea agreements for all

14 the defendants.

15    MR. SCHMIDT:  Understood.

16    THE COURT:  So how much time do you think you need to

17 finish your discussions?

18    MR. BARSHIS:  I was hoping for at least five to ten

19 minutes in the hallway that I could discuss this with my client

20 since --

21    THE COURT:  Okay.  And then, again, don't lose track

22 of my offer.  If you have people from the East Coast, we can

23 put them on, but I have scheduled a certain amount of time for

24 today's hearing, and when we run out of time, we run out of

25 time.

1    So I'll go back and give you -- we'll resume in

2 15 minutes.

3    MR. BARSHIS:  Thank you.

4    THE COURT:  Thank you.  Let's just say 9:00.

5    DEPUTY CLERK:  All rise.  This court stands in recess

6 and will begin at 9:00 a.m.

7    (Recessed from 8:43 a.m. to 9:05 a.m.)

8    DEPUTY CLERK:  All rise.  His Honor, the Court, the

9 United States District Court is again in session.

10    THE COURT:  Have a seat, everybody.  Where are we at?

11    MR. SCHMIDT:  Your Honor, we are going to increase the

12 cap to 24 months and all the other provisions will stay the

13 same.  We'll go forward with sentencing and I'll make my pitch

14 to you, and whether or not you accept it, that's up to you.

15 It's the low end of the guideline range.

16    THE COURT:  Again, I have got enough other problems

17 with your plea agreement, I'm not going to accept it.  So if

18 you want to go -- if he wants to go forward with open

19 sentencing today, that's fine, but I'm concerned about the fine

20 structure, concerned where the money to the Indian -- no,

21 what's the name of the Department of Interior's --

22    MR. SCHMIDT:  That I don't think is as big of an

23 issue.  Department of Interior can actually designate that

24 money to wherever they want.

25    THE COURT:  That's not what the plea agreement says.

1     MR. SCHMIDT:  It goes to them and they would dole it

2  out.  If you want to make a specific recommendation as to where

3  the money should go --

4     THE COURT:  Have you looked at other options?  There

5  is an arts fund in Alaska.  Have you looked at that?

6     MR. SCHMIDT:  We could give it to Central Council

7  here, Tlingit Haida, and they can dole it out.

8     THE COURT:  How did you come up with $10,000?  Was

9  that plucked out of the air, because --

10     MR. SCHMIDT:  Typically, we make that monetary amount

11  based on the expense of the investigation, the moneys that we

12  expend to investigate the case.

13     THE COURT:  Look, I don't think the defendant, and I

14  don't want the defendant to make a rushed decision on something

15  that could impact his life for more than two years, actually,

16  up to 30 months.

17     And I have, as I have stated before, I have other

18  problems with the plea agreement; for instance, this $50,000

19  fine, which probation says they can't afford, and you say in

20  your sentencing memorandum this is critical that there be a

21  fine so that there be a message sent to those who would commit

22  this in the future.

23     And so I'm just -- I'm not inclined to have my hands

24  tied in this case.  And even under your modification, which I

25  appreciate the effort, I'm still -- you're still proposing a

1  (C) agreement, in which I am limited as to what I can do.  I'm

2  not trying to forecast for you that I'm going to go to the top

3  of the guideline range, but I'm also trying to tell you I'm not

4  willing to have my hands tied.

5        Okay.  So do you want to go forward with an open

6  sentencing or do you want to --

7        MR. BARSHIS:  No.

8        THE COURT:  How long is this case going to take to

9  try?

10        MR. SCHMIDT:  I would say a couple of weeks.  Maybe

11  three weeks.  There is a lot of documentation in this

12  particular case.

13        And I would also point out to the Court, while the

14  defendant has agreed to the monetary amount of the loss, that

15  was based on receipts and that was an agreement that we had

16  made, but we have, for restitution purposes, it's $54,000.

17        THE COURT:  So explain to me the -- can you explain to

18  me the finances when in your sentencing memorandum you say that

19  it's over a million dollars in losses, yet, even the losses

20  listed as losses that are going to be reimbursed to the

21  victims, it's $54,000.

22        MR. SCHMIDT:  So the amount of loss, which was agreed

23  upon for sentencing purposes, was $1 million based on the

24  receipts for that particular year that we had evidence for.  As

25  for the particular loss of individuals, we had sent out notices

and tried to contact as many witnesses as we had. There was
some damage to some of the documents that resulted in us not
knowing who they were or being able to track them down. The
ones we did track down, we sent out letters to them and they
sent letters back to us. And then they either wanted
restitution or they didn't want restitution or they wanted to
submit a letter to the Court.

THE COURT: I reviewed the letters, and you're right,
I mean, it was only a couple that said they didn't want some
sort of restitution.

And then another question I have about the facts as
laid out in this case were that there were some local
individuals, some of whom, I assume from the descriptions, were
Alaska Natives, who were part of the scheme.

MR. SCHMIDT: Correct.

THE COURT: And I don't know --

MR. SCHMIDT: There is one that's coming up for
sentencing or change of plea before Your Honor -- or before the
district court.

THE COURT: In this case?

MR. SCHMIDT: Yes, that's Mr. Macasaet.

THE COURT: Go ahead.

MR. BARSHIS: Your Honor, I would just note that as a
part of the plea agreement, my client came in and was willing
to assist in all of those cases involving the Alaska Natives

1   that were a part of this common scheme, so that was part of the

2   thought process that went into all of these negotiations.  My

3   client has flown up here on multiple occasions, but

4   specifically to sit down with the government and agents to

5   discuss what they knew and how they could help.

6          THE COURT:  All right.  So your proposal is that the

7   plea agreement would be modified to raise the top of the

8   range --

9          MR. SCHMIDT:  Correct.

10          THE COURT:  -- from 18 to 24 months, which is the

11   bottom of the range?

12          MR. SCHMIDT:  Bottom of the guideline range, yes, sir.

13          THE COURT:  And then the fine would still remain

14   $50,000?

15          MR. SCHMIDT:  That's correct.

16          THE COURT:  And $10,000 would still go to --

17          MR. SCHMIDT:  Indian Arts and Crafts Board.

18          THE COURT:  Is there a representative from the board,

19   or do we know if there is somebody here?

20          MR. SCHMIDT:  She's the director and she's here.

21   She'll be making a statement.

22          THE COURT:  Again, I don't want -- I don't want that

23   amount to be -- I would prefer that money be spent assisting

24   Alaska Native artists.

25          MR. SCHMIDT:  If the Court wants to do that as an

additional donation, I don't really care if it's a fine or not.

I would be willing to modify that to have $60,000 go to the

ICAB, and then you can make the determination to give it to

those particular programs.  I would be fine with that.

THE COURT:  Instead of a fine?

MR. SCHMIDT:  Yes.

THE COURT:  And I do think that's not inconsistent

with probation's recommendation of no fine.

Didn't you recommend no fine?

PROBATION OFFICER:  That's correct, Your Honor, based

on the financial investigation.

THE COURT:  All right.  Well, I think with those

modifications, I would certainly -- probably in this case, it

doesn't -- he has no criminal history, so I would be

disinclined to sentence him to anything above of the bottom

range in any event.

So I think with those modifications, I'm willing to go

forward with this defendant, but I will tell you that I'm not

so inclined with his wife and his son, and we can talk about

that more when we finish with this case.

MR. SCHMIDT:  That's fine.

THE COURT:  I'm looking at defense counsel.  I

understand you're saying it's fine.  He's the one who is going

to have to let me know what he wants to do or what his clients

want to do.

1    And I mean, the reason I raise this now is I don't

2  know if this is an all-for-one and one-for-all or not.

3  Obviously, each defendant has to make their own individual

4  decision.  So are you prepared to go forward with your client?

5    MR. BARSHIS:  Yes, Your Honor.

6    THE COURT:  Okay.  All right then.  Give me a second.

7    The defendant pled guilty to one count of conspiracy

8  in violation of 18 United States Code Section 371.  It's a

9  Class D felony, as well as Count 2, misrepresentation of Indian

10  produced goods and products in violation of 18 United States

11  Code Section 1159(a), which is also a Class D felony.  A

12  presentence report has been prepared from which no information

13  has been withheld.

14    Mr. Rodrigo, sir, have you had a chance to read

15  through the presentence report and talk it over with your

16  counsel?

17    THE DEFENDANT:  Yes, sir.

18    THE COURT:  Okay.  When imposing sentence today, I'll

19  be relying upon the information in the presentence report as

20  well as any -- well, as well as the written submissions of the

21  parties and any additional arguments or statements made here

22  today.

23    And as I noted earlier, but I want to just make sure

24  that I'm clear, when I look at the presentence report, I see

25  no -- well, there were some changes made to the draft, but as

far as the final PSR, there's no outstanding objections to the

PSR; is that correct?

MR. SCHMIDT:  Correct.

MR. BARSHIS:  That is correct.

THE COURT:  In that case then, I do find an adjusted

offense level of 17 with a criminal history category of I.  It

calls for a sentencing range -- well, the maximum is five years

of imprisonment, the sentencing guideline range is 24 to

30 months; supervised release of one to three years on both

Counts 1 and 2; a fine range of $10,000 to $95,000; restitution

in the amount of $54,204.81; and a $100 special assessment for

each count for a total of $200.

And then if we can just turn our attention briefly to

the plea agreement.  This is an agreement under 11(c)(1)(A),

(B) and (C), and thus, if I accept the plea agreement, I'm

bound to the recommendations of the parties.

My understanding, and I just want to be clear on the

record, is that there has been two modifications, as I

understand it.  One is that the period -- the parties agree

that the -- well, what it says here is that the government will

not seek a period of incarceration of more than 18 months to

serve, which is not the same thing as limiting my ability to

sentence him, which is why I had a question mark next to this.

I think what the parties really --

MR. SCHMIDT:  It was a cap of 18 months.

1      THE COURT:  It was a cap of 18 months.  And so the

2  parties today have, based upon concerns that I have raised

3  about the agreement, have agreed to raise the cap to 24 -- up

4  to 24 months, which is the bottom of the guideline range.  Is

5  that correct?

6      MR. SCHMIDT:  Correct.

7      MR. BARSHIS:  That is correct.

8      THE COURT:  Have you had a chance to talk this over

9  with your client?  He understands that?

10      MR. BARSHIS:  I did, Your Honor.

11      THE COURT:  And then there is one other modification,

12  which is there is a fine -- there is a $10,000 donation to the

13  Indian Arts Fund, and then there is also a $50,000 fine.  The

14  government is fine with restructuring that and not imposing any

15  fine, but rather that the defendant would be obligated to

16  provide, I guess, jointly and severally with the other

17  defendants in this case; is that correct?

18      MR. SCHMIDT:  These are individual as to the Indian

19  Arts and Crafts Board donations.  Now, the restitution is joint

20  and several.

21      THE COURT:  The restitution is joint and several.  So

22  then -- well, we'll address the other defendants when we come

23  to it, but rather than a $50,000 fine, the modification I

24  thought I heard you indicate was $60,000 in total as a

25  donation -- as a payment to the Indian Arts Fund.

1    MR. SCHMIDT:  Yes.  Correct.  To the Indian Arts and

2  Crafts Board for the Court to designate to whatever programs

3  that you would want.

4    THE COURT:  Again, this is a chicken and an egg thing

5  here.  I know you have a representative from the board here,

6  but I would like the proceeds to go to the Alaska Native arts

7  community, because that's the arts community that was impacted

8  by this crime, not -- I mean, I know there is other crimes

9  committed in appropriation of American Native art, but I want

10  the harm remediated here.

11    MR. SCHMIDT:  I think I could do that -- President

12  Peterson with Tlingit Haida Central Council indicated that they

13  would be willing to accept the funds and designate it for that

14  particular purpose.

15    THE COURT:  It would have to go through the national

16  fund for the Department of Interior, would it not?

17    MR. SCHMIDT:  Unless you designated the donation to go

18  to them specifically, that way you cut out the middleman.

19    THE COURT:  Have you spoken with the representative of

20  the arts fund who flew all the way up here to tell me why I

21  should follow through on this going to them as opposed to what

22  you just proposed?

23    MR. SCHMIDT:  She agrees with me it's the cleanest way

24  to do it.

25    THE COURT:  It would go to the Tlingit Haida --

1      MR. SCHMIDT:  Central Council.

2      THE COURT:  I don't want it to go to the Tlingit Haida

3  Central Council for them to do whatever they want.  The

4  intention is to remediate the harm done by this type of conduct

5  which is impacting Alaska Native artists.

6      MR. SCHMIDT:  Stand by.

7      (Pause)

8      MR. SCHMIDT:  President Peterson indicated to me you

9  could designate it to the Tlingit and Haida Central Council

10  Vocational Center, and that is --

11      THE COURT:  And they teach art skills there?

12      MR. SCHMIDT:  Yes, and then they could --

13      THE COURT:  Any objection to that?

14      MR. BARSHIS:  No, Your Honor.

15      THE COURT:  So we'll make that additional adjustment

16  in this case.

17      So again, you both have talked -- I mean, I can't

18  write the plea agreement for you, but this is an adjustment

19  you're making to your plea agreement?

20      MR. SCHMIDT:  Yes.

21      THE COURT:  It sounds like the defendant does not

22  disagree.  So with those modifications, I do now accept the

23  parties' plea agreement.

24      And I'm happy to hear your arguments as to what

25  sentence I should impose in this case, taking into

consideration the factors identified in 18 United States Code
Section 3553(a).

I don't know if you have any witnesses you want to put
on before you make your argument.

MR. SCHMIDT: Your Honor, I do have some people here
that would like to make a statement.

THE COURT: If they want to make a statement, they can
come up to one of the microphones here. I would simply ask
that you state your name and spell your name for the record,
and then go ahead and make your statement.

MR. SCHMIDT: The first person that will be speaking
will be James Johnson. He's a Tlingit artist who resides in
Arizona.

MR. JOHNSON: James Johnson, Tlingit Indian, born and
raised here in Juneau, Alaska.

THE COURT: How do you spell your last name?

MR. JOHNSON: J-o-h-n-s-o-n.

THE COURT: Thank you very much. Go ahead, sir.

MR. JOHNSON: (Speaking in Native Alaskan language.)

My name is James Johnson, Tlingit Indian, born and
raised here in Juneau, Alaska. I belong to the Dakl'aweidi
clan, which is the killer whale clan. My family lineage is
from the Xutsnoowu Kwaan. My Tlingit name is Onn-iss-kwah,
which means "man who stands alone strong." That name was given
to me by my grandfather, Chief Peter Johnson of Xutsnoowu.

1          I'm a Tlingit artist and carver.  What I do -- there

2     is no word for art in our language.  So everything you see, all

3     these pieces that you see were completely integrated as part of

4     our culture.  It explains our history of our people.  This is

5     where we came from and this is our lineage that goes back

6     thousands of years in Southeast Alaska.

7          For me, I've dedicated my life to pursuing this art

8     form.  I've been carving for 15 years.  It's not a hobby that

9     you do.  You dedicate everything you have to learning it and

10    carrying it forward.

11         What makes it sacred is the art form went through a

12    period of time where you weren't allowed to do it anymore.  So

13    this knowledge that's been passed down for generations was

14    severed completely.  Artists today, we're picking up these

15    broken pieces that we have left and carrying this culture and

16    this tradition forward through the art form.

17         And for me, carrying this forward means everything for

18    my lineage.  I teach the art form as well here in Juneau,

19    Alaska.  I teach in Washington state.  I live in Phoenix,

20    Arizona.

21         And so again, like with this art form, it's so much

22    more than just esthetics that are meant for market; it's a

23    history.  And those stories and that history is told through

24    any object, told through a paddle, a mask, a bentwood box, a

25    totem pole.  All these objects tell that story and that history

1  of our people.  This is our lineage.

2          And so like for anyone that pursues this that's

3  carrying along this tradition on their shoulders, more than

4  just trying to create an art piece for market.  It's so much

5  bigger than that.  And the sale of non-authentic Tlingit art

6  directly impacts artists who have dedicated their life to

7  carrying this forward and bringing this art form back up to

8  what it once was.  And it's a culture and it's a tradition.

9          For me, you know, you find your purpose in life, what

10  you're meant to be doing with your life, and whether I chose to

11  do this or it chose me, this is exactly what I meant to be

12  doing by carrying it forward.

13          Born and raised here in Juneau, Alaska, I have been

14  fortunate to make a career out of being a Tlingit artist, but

15  part of the brands and the people I work with, we give back to

16  this community in Juneau, and that's from being an authentic

17  Tlingit artist.

18          I'm an artist for Vans, and we donated a portion from

19  my collection back to Juneau that gets indigenous kids up to

20  Eaglecrest, learn how to ski and snowboard.  It's a positive

21  thing that we're creating here through the art form.

22          And, again, like the ripple effect from this, it goes

23  out further than just Alaska.  Stealing our culture, stealing

24  our tradition, affects a number of different people all through

25  the chain.  I wouldn't be able to do this if it wasn't for my

1   passion and my direction of pursuing the Tlingit art form and

2   bringing this culture back to what it once was.  And so it's

3   important -- I know like the details of the case are real

4   specific, what money goes where and this goes there, but we

5   need to set an example that this is not okay.  This not okay

6   for galleries to be selling non-authentic Tlingit art to these

7   consumers, because it's not just art they are selling, they are

8   selling our culture, they are selling a tradition that at one

9   point in time everything that could have been done was done to

10  destroy this culture, and so we're trying to bring that back.

11          And it's so much more than just esthetics of art and

12  trying to create margins from it.  And so for me, I'm really

13  happy to come here.  I traveled all the way from Phoenix,

14  Arizona to come speak today and share what my journey is and

15  how this affects artists, because what we do is so much bigger

16  than create something for a market.  You dedicate your whole

17  life to this art form.

18          And it's hard, carving is hard, drawing is hard.

19  Everything you see visually is difficult to do.  And passing

20  that knowledge on to the next generation is also my purpose as

21  well and bringing that forward.

22          And this theft of our culture, this theft of our

23  heritage, affects us deeply, more than just in a monetary

24  sense.  So that's why it's really important that we get a grasp

25  on this.  And it's not going to be fixed today.  It's not going

to be fixed tomorrow, but we need to start moving towards
solving this issue, and that way we can thrive again, we can
bring the culture back again.  So that's my piece.  That's all
I wanted to say.

THE COURT:  Thank you very much.

MR. SCHMIDT:  Richard Peterson, President of Tlingit
Haida Council.

MR. PETERSON:  Good morning, Your Honor.  My name is
Richard Peterson.  R-i-c-h-a-r-d, P-e-t-e-r-s-o-n.  My Tlingit
name is Chalyee E'esh.  I'm Kaagwaantaan from the Eagle's Nest
House.  Telling you who I am, I just told you who my mother is,
her mother, her mother, back since time immemorial.

It's important to be here today as the President of
Tlingit and Haida.  Of the 229 tribes in Alaska, we're the
largest at over 37,000 tribal citizens worldwide.  Of the 574
tribes in the country, we're the twelfth largest.

I understand that the defendant is from Washington.
If you took all the Tlingits and Haidas in Washington state, we
would be the third largest tribe in Washington state.  So when
we speak, we speak with the knowledge of our ancestors that's
been passed down since time immemorial.

I took off my shirt because I wanted you to see my
tattoos, my traditional tattoos, the art of our people.  This
tells you who I am.  Our art is everything to us.  It's not
just symbols.  They are not just items.  In the Tlingit

1    language, we refer to these items as atoow; they are sacred,

2    they are with spirit.

3            I was born in Ketchikan, raised on the Island of

4    Prince of Wales in the Village of Kasaan, the oldest of the

5    Haida villages in Alaska, surrounded by totem poles and a

6    massive longhouse that I dedicated my life to restoring, to

7    finding the few artists left who could restore that house.

8            I have dedicated my life to my tribe and my people.

9    Of the Tlingits and Haidas, 37,000 people, we have two fluent

10   Haida speakers left and less than 50 Tlingit speakers left.

11           As we watch our culture and our language dying and

12   working to restore it, it's our art that we also work to

13   restore and to uphold, because it is our art that told you who

14   we are, that told our stories.  We didn't have a written

15   language.  We had it only oral and through our art.

16           We watched colonization come and we watched the

17   bombardment of villages by the United States Navy, the

18   community of Angoon, which Mr. Johnson is from, almost entirely

19   wiped out.  The same for Wrangell.  And I'm forgetting Haines.

20           How our stories and how our culture survived were the

21   few artifacts that were remaining, that were hidden, that were

22   passed down, or those that were stolen and you now find in

23   museums across the country in Russia and Europe.  Our

24   connection to our art is very much the core of who we are.

25   It's not just a symbolic thing.

1          Again, this next weekend, I'm traveling to Wrangell,

2    Alaska where we're going to return over 20 items to the

3    community, and we have been doing this over the years.  When we

4    see our atoow, our items come back, our sacred objects, we see

5    a cultural revitalization.  We're seeing clans tell their

6    stories openly again.  We're hearing people use our language

7    again.  And we're seeing pride in the faces of our young people

8    come back.

9          Our artists are sacred to us.  They keep us alive, and

10   our traditional ways, they were themselves sacred.  They were

11   honored and considered a treasure unto themselves.  In the

12   traditional times, our whole clan would take care of these

13   artists because they did this important work.

14         In modern times, they have to take care of themselves,

15   and they do that through their artwork so that they can keep

16   that alive, this sacred activity that keeps our culture, that

17   tells our stories, tells us who we are, where we come from.

18   How we honor our deceased, how we honor our clans, how we lift

19   each other up, it is all done through our art.

20         You see beautiful totem poles being carved.  When I

21   moved to Juneau to become the President of Tlingit and Haida

22   nine years ago, there were probably less than five or six totem

23   poles openly displayed in Juneau.  Now you see them all over,

24   not because there is so many, but because there is such a rich

25   dedication to bringing back our art and telling who we are and

where we come from. I testified once to the City and Borough of Juneau, and I was told, well, you know, Juneau wasn't even a traditional place, it's not where the Tlingits were from. And I just spoke back and said, "That's funny, your building is on top of the old village. If you walk through your own building, you will see the pictures of the village here that you pretend didn't exist."

And they are able to pretend we didn't exist here because there weren't totem poles, because we weren't telling who we are, where we're from, whose land this is. Do you know that we're on the Aak'w Kwa'an? Do you know our neighbors, the T'aaku? We know because of our stories passed down to our lineage through our art, through our totem poles. We know who we are. We know where we come from. And we're able to represent that because of our art.

Today, Tlingit and Haida people can be doctors, lawyers, and everything in between. Yet today we still revere our artists the most, because they are upholding who we are, they tell who we are, they represent who we are with pride.

I wondered if I would come in and reading the papers if I feel sorry for the defendants. I can tell you I do not. I don't care that this is your first crime, because it's a crime that's been committed to our people now for generations.

I come from a long history of village on my Haida side where Walt Kasaan was pillaged. People literally took our

carvings.  They took pieces of our longhouses.  Sometimes they took our whole longhouses.  They dug up graves from our highest chiefs so that they could profit, so they could sell them in their curio shops.

And what you, sir, and your family are doing today is no different than what those people have done to us since the time of colonization.  I worked very hard on behalf of my people.  Many of our people work very hard on behalf of our people to keep our culture alive, to make sure that we're recognized, we know who we are, and we do through our art.

Our artists only survive because they are able to market and sell their art, and when you take that from then, we lose.  Just like we're losing our languages, we lose our artists.  And our artists are who can still speak for us and tell us who we are.

I thank you, Your Honor, and I appreciate you for being here.

THE COURT:  Thank you.

MR. SCHMIDT:  Your Honor, the next person that's going to make a statement is Wayne Price.  He's a Tlingit totem carver and he's from Haines, and also a UAS professor.

THE COURT:  Sir, state your name and spell your last name for the record.

MR. PRICE:  My name is Wayne G. Price.  My Tlingit name is Aayaank'i.

1    I'm an artist.  I have been for my whole life.  I have
2  38 totem poles standing in Southeast Alaska alone.  I'm also
3  responsible for the creation of 15 dugout canoes.
4    I'm here today to tell you that our art is our voice.
5  It belongs to us.  Has been for all time.  And I have dedicated
6  my whole life.
7    I'm also a professor at the University of Alaska
8  Southeast here in Juneau.  I'm just preparing for another
9  semester.  Our art is our voice.  It means a lot to us.  Has
10  been our art for thousands of years.  It had meaning.  It's our
11  connection to the seen world, to an unseen world, and it went
12  like that for thousands and thousands of years.
13    Of course the sailing ships came and a big change
14  happened.  It happened to all of us.  That change was not very
15  good for us, but we're recovering now.  We're coming back.
16  There is a resurgence.
17    I just returned from a 180-mile canoe journey from
18  British Columbia down into Washington in my dugout canoe.
19  We're touching our culture, we're bringing it back.  We asked
20  to be left alone.
21    Our work, our art has deep connections with the water,
22  the earth, the sky, it goes way back for a long time, always
23  will.  And so much has been taken.  We lived in a time of take,
24  take, take.  Now, the resurgence, because all of us are working
25  together, are standing together, we're bringing it back.  Our

language, our art, our dances, it's finally coming back. It
was not that long ago it was illegal to do these things, but
this is a change now.

We're in a new time. Our people are bonded together.
We're standing up. We'll be counted. And you know, you have
your culture, I have mine. Honor yours as I honor mine.
That's all we ask.

I'm here to speak in an honorable way for my people,
my culture, my heritage that we stand up and let us be counted.

THE COURT: Thank you.

MR. SCHMIDT: Your Honor, the final person that will
be making a statement here is Meridith Stanton with the Indian
Arts and Crafts Board, who is the director.

THE COURT: Thank you.

MS. STANTON: I can't be nearly as eloquent as these
people before me. My name is Meridith Stanton,
M-e-r-i-d-i-t-h, S-t-a-n-t-o-n. I am the director of the
Indian Arts and Crafts Board at the U.S. Department of
Interior. I have been working for the board for over 40 years.

I have been involved with Indian Arts and Crafts Act
issues since the 1990 act was enacted, and I wrote the
regulations for the act, for entry to subsequent amendment.

As I believe you know, the Indian Arts and Crafts Act
basically says that unless an art or craft product is made by
an American Indian or Alaska Native it cannot be sold, should

not be sold as an authentic Alaska Native or American Indian art product.

For many people in the Alaska Native communities, and certainly in the Lower 48, in addition to the importance of carrying on traditions from one generation to the next, it is also a very key part of their economies.  Alaska Natives and American Indians rely on the production of art not only to put food on the table, to pay for transportation and other critical family needs, so when counterfeit work is entered into the marketplace, it has a devastating impact on multiple levels.

I know that oftentimes some folks may look at the Indian Arts and Crafts Act violations as minor crimes, but in fact, counterfeit Indian and Alaska Native art really tears at the soul of Alaska Native and Indian communities.  It is not just an economic crime, but it is also something that has a detrimental effect on passing down traditions from one generation to the next, as eloquently described by James and Mr. Peters and Wayne Price.

These crimes are very significant, not only in Alaska, but the Lower 48.  And I can tell you that many times people will come up to us from both communities and thank us for our work and encourage us to continue on in our efforts to rid counterfeit Alaska Native and American Indian art from the marketplace in which they must compete.

So, again, this is not a minor crime, and we really

believe that the Court, and I believe your opinion is that
these crimes should be taken very seriously.  So I want to
thank you for this opportunity to express the concerns of the
Indian Arts and Crafts Board and the U.S. Department of the
Interior.

        THE COURT:  Thank you very much.

        MR. SCHMIDT:  That's all the statements, Your Honor.

        THE COURT:  All right.  At this time then I'll hear
from counsel as to your recommendation as to an appropriate
sentence taking into the consideration the factors identified
in 18 United States Code Section 3553(a).

        So you know, I have read your briefs, so you don't
need to repeat what you have in your brief, but if there is any
additional arguments you would like to make.

        I'll start with Mr. Schmidt.  Go ahead.

        MR. SCHMIDT:  Your Honor, in looking at fashioning an
important sentence, the Court should look at the 3553(a)
factors.  The Court is well aware of the nature and
circumstances of this offense.  The defendant had essentially
two businesses, one that sold stone carvings and another one
selling totem poles that were selling Philippine-made with
Philippine labor carvings.

        This was a business that the defendant had started
initially as a carver himself and then basically moved into a
production mode where they were able to produce more carvings

because of his wife's associations with other people that were

in the Philippines and were able to train them to carve as

well.

THE COURT:  Didn't they found a company in the

Philippines?

MR. SCHMIDT:  They did.  It was Rodrigo Creative

Crafts that was founded by Ms. Rodrigo.  And he went over there

for a period of time to train them on how to carve and the

types of carvings that he wanted.  Then they would buy those

for $8, $10, $20 apiece, put them in a cargo van, bring them

over and import them into the United States.

And so because of that corrupt price difference and

the demand and the requirements of people that come to Alaska

that want authentic Alaska Native artwork, they were able to

price those items for thousands of dollars, and if they weren't

able to make a sale, they were able to at least undercut

whatever -- they could undercut themselves to make the sale,

which in turn undercuts everybody else.

So they could put a price out of $5,000, somebody

comes in and says, "Yeah, that's just too much.  How about

this, I'll give it to you for $3,000 and I'll throw in another

piece."  It's not really any loss to them.  They are making a

profit regardless.

And it's a business practice that many legitimate

Alaska Native artisans can't compete with, nor even just honest

Alaska artisans, where artisans that actually do carve, they
don't misrepresent their artwork, they produce artwork and sell
items -- we have heard stories of people selling items and
people coming back and saying, "I gave you an authentic Alaska
Native piece over here and why don't you give me a discount or"
-- and it's cheaper.

          And they say, "Look, I carved that, I'm not Alaska
Native, but I put the energy into this," and they get
undersold, even if they tell them that they think it's fake.

          THE COURT:  I read one of the letters, and I think
that's the only source I saw where the defendant -- actually, I
think it's the son, was cold calling former customers to sell
even more art.  Did I read that correctly?

          MR. SCHMIDT:  That is correct.  And that was during
the COVID years when there was no cruise ship traffic and they
were trying to make sales by contacting other customers that
had previously bought items, and the defendant had done that
too, as well as his son.

          And so, you know, the circumstances of this was a
pretty sophisticated fraudulent scheme that they had been
engaged in.

          The history and characteristics of the defendant, he
doesn't have any prior criminal history.  This is a white
collar offense.  As I said before, it is a fairly sophisticated
operation that occurred over the course of years.  He doesn't

have any substance abuse or any other criminal convictions. I

think the negotiated sentence previously for 18 months was an

appropriate sentence, given the fact he had come in and

basically taken responsibility and was willing to take the hit.

However, the Court has up to a cap of 24 months that it may

impose.

The seriousness of the offense, this is a serious

offense. As stated by Ms. Stanton and our other speakers,

first and foremost, it's a truth and advertising law. You

know, there is rampant misrepresentation throughout Southeast

Alaska. I can tell you that half the businesses probably

misrepresent at some point or another to make a sale. I mean

it really comes down to it's a money game and you can make a

lot of money.

And when you have 20,000 people come off cruise ships

and you have a portion that want authentic artwork, it's not

that hard to say a few words and say that guy is an authentic

artist, Alaska Native artist that made that piece, and they are

able to make those sales.

There is victimizing of the people that are the

customers who believe they are purchasing authentic artwork and

willing to pay premium. There is the economic effects over the

overall industry. It creates an unlevel playing field for

legitimate businesses selling authentic Alaska Native art by

out-pricing them and other legitimate Alaska artisans who

1     actually follow the law, and they can't compete either.

2         And this type of scheme and this type of industry is

3     very successful.  They were able to make a million dollars in

4     sales in one year.  And the overall industry probably makes

5     tens of millions just here in Southeast Alaska.

6         So I think that the effect is not just to the artisans

7     themselves, but it is widespread.  It's much more than a

8     typical white collar crime where somebody commits an online

9     offense and defrauds people out of some money, you have that

10     particular individual that's defrauded.  Here it's that victim,

11     the culture, the entire business community.  It's way more

12     widespread than your typical white collar offense.

13         Also creating a mistrust in the market where people

14     who do want to seek out these things have a hard time

15     determining what is authentic and what is not, and they may not

16     buy things because of that, and that also affects Alaska Native

17     artisans.

18         And I know the Court and I have had many discussions

19     about deterrence and deterrence of others.  I believe that a

20     jail sentence and the donation and a felony conviction is going

21     to at least deter this defendant, but it also will deter

22     others.  One of the things that these types of cases really get

23     from the media is that they pick up on these stories, and this

24     is an important story because the type of effect that happens

25     and the people that it affects.  It does create a deterrence of

1   others.

2        THE COURT: Let me ask you a question about that,

3   because your plea agreement only calls for the publication for

4   two weeks in the local Ketchikan newspaper, which seems an

5   awfully myopic message to send when you just noted that this

6   occurs all throughout Alaska and to Native artists.

7        Why would you focus on a local newspaper in Ketchikan

8   when there is certainly --

9        MR. SCHMIDT: I'm not saying in Ketchikan. I think

10   all of Alaska, I mean, there was --

11        THE COURT: No, no. What I'm saying is your plea

12   agreement calls for the defendant to pay for two weeks of

13   publication in a very small narrow market when you just said

14   this is much broader throughout Alaska. Why are you limiting

15   yourself --

16        MR. SCHMIDT: That was the area where the offense was

17   committed, in Ketchikan, Alaska, and so that would be the

18   request and has been for many of our other cases where we

19   have -- where the offense occurs, and then it can be taken from

20   there from news agencies that want to print that.

21        THE COURT: Go ahead.

22        MR. SCHMIDT: And so I think that the agreed -- the

23   sentence that we had previously discussed will do that. And I

24   think that deterrence of others is an important aspect and

25   actually probably one of the most important aspects of trying

to get rid of fake art and also to strengthen the Alaska Native

Indian art community by making sure that things that are being

sold and represented as such are what they are.

And I put two examples where once these types of cases

have come out, you know, agents go through and they do kind of

like spot checks, it does reduce the number of people that are

able to misrepresent.  Now, there is going to be people that

are going to continue to misrepresent, and those are the people

we end up focusing on for future prosecution.  However, I think

that the deterrent effect for others is quite high in this

particular case.

So I would ask the Court to impose the sentence that I

had previously, the 18 months.  The Court can go up to

24 months.  We had modified the agreement for the $60,000

donation to Tlingit Haida Central Council Vocational Center,

and they don't have to pay a fine, and he'll be on supervised

release.

And I believe that under the 3553(a) factors, that all

of those concerns are going to be met with that sentence.

Thank you.

THE COURT:  Thank you.

Sir, how do you pronounce your last name again?

MR. BARSHIS:  Barshis.

THE COURT:  Thank you, Mr. Barshis.  Go ahead.

MR. BARSHIS:  Thank you, Your Honor.

1          Your Honor, sitting here listening to all of the

2     effects that, I guess, are given, garnered by the conduct of my

3     client, I think he takes that to heart.  This was not a crime

4     of malice, but it was one of ignorance.  It's one in which my

5     client was taught by an Indian carver, a Native on how to carve

6     these things, and he saw an opportunity.

7          He didn't know the ripple effect.  I don't think that

8     he understood the impact it would have on everybody sitting in

9     here today.  I don't believe that this is an individual that

10    intentionally went out to harm people.

11         THE COURT:  But he and his family intentionally went

12    out to lie, right, because if I understand the facts of this

13    case correctly, they represented themselves as Native Alaskans,

14    as part of a Native Alaskan family who traditionally produces

15    artwork.

16         MR. BARSHIS:  They did to an extent, yes, Your Honor,

17    they came up with a story.

18         THE COURT:  A story is a euphemistic way of saying a

19    lie.

20         MR. BARSHIS:  And I'm a defense attorney, Your Honor,

21    that tries to couch it in the best possible light.

22         THE COURT:  I get it, you're doing your job.

23         MR. BARSHIS:  You're correct, it is a story that they

24    created.  Was it a story that they set out to create to

25    perpetuate this?  I don't know that that was the initial

intention; however, they met individuals that worked for their shop that were Alaska Natives that sounds like will likely be coming before Your Honor for pleas and sentencings.

THE COURT:  That's what I heard.

MR. BARSHIS:  And those individuals provided them with the information and the ability to perpetuate that story, indicating to them that they would be able to sell it for a higher profit should they be able to create this story.

In no way am I justifying or de minimizing what they did, but what took place was not just a simple individual that went out to try and create a false narrative on his own to perpetuate this scheme.

Your Honor, I think looking at the factors, I think looking at the deterrence effect, looking at all of the negatives that were pointed out that came from this crime, we have an individual here though that I don't believe would ever be back before Your Honor or any court for anything similar to this, or quite frankly any crime ever.

This has had a long lasting effect not only on Mr. Rodrigo, but his entire family.  They have now succumbed to very minimal means.  They work as vendors selling hotdogs outside of Lumen Field.  They are working to get their life put back together.

My client really is stepping forward because he has no other concern than his family at this point and trying to make

1    this situation right.  He was very forthcoming from the very

2    get-go, Your Honor.  As soon as their storage unit was seized,

3    they said, "It's yours."  They didn't contest the approximately

4    $3 million in assets that were taken or merchandise.  They

5    didn't try and contest the facts that were being presented.

6          In fact, they decided to say, "We will help in any

7    way, shape or form that we possibly can."  They now understand

8    the magnitude of what their actions created, the harm that it

9    has done to others, and I don't believe that they will ever put

10   themselves in a situation to be back before this Court or any

11   other doing something similar.

12         What we are asking, Your Honor, is that the 18 months

13   that was originally put before the Court be suggested or

14   converted to electronic home detention in this case.  My client

15   currently has a 21-year-old daughter who is suffering from

16   kidney failure.  He is trying to be there to support her, not

17   knowing how much of an effect that's going to have on her

18   overall life and longevity.

19         He wants to be there to try and help support his

20   family through not only the financial means, but the emotional

21   support that is needed throughout this process.

22         My client understands his wrongs, and he's willing to

23   take whatever punishment the Court hands down.  We're just

24   asking that the Court take into consideration the fact that my

25   client has no prior criminal history, the fact that my client

has been very forthcoming once realizing the magnitude of his

situation and the ripple effect that it had, and the fact that

he was willing to come forward and present information on other

individuals that may be carrying out these same practices once

he realized the damaging effects that this type of a crime can

have.

Your Honor, I believe 18 months on electronic home

detention would be appropriate in this case.  It would be a

deterrent.  It would take the seriousness of the allegations or

the crime into account.

So for those reasons, Your Honor, we would ask that

the Court follow the recommendation that was originally put

before Your Honor; the only difference is we would ask that the

Court allow it to be converted from 18 months of prison to

18 months of electronic home detention.

THE COURT:  Thank you.

Mr. Rodrigo, you have an opportunity to speak before I

impose sentence.  You don't have to say anything, but if there

is anything you would like to say, this is your opportunity.

You don't have to stand, you can just pull the

microphone closer.

THE DEFENDANT:  Your Honor, all those years, I'm stone

carving, sir, I am an artist, stone carving.  I don't want to

carve totem pole.  I don't want to -- I operate the gallery for

eight years, never I did totem pole, I just bought the totem

 1    pole business, sir, so I inherited it.  So this business is --

 2    I didn't -- there is a guy that put me in this business.

 3         His name is John Fathom.  He works in Canada now.  So

 4    over the years he did pay me, then I end up in Ketchikan to run

 5    the business.  I have to buy that.  He owed me money, so I have

 6    to come and operate the business.

 7         Then this guy, he's like my son, he's a Tlingit guy

 8    worked for John Fathom, he came and worked for me.  Then she

 9    hired all the Native work for the gallery, sir.  I never -- I

10    don't know what to say to the art or what the story.  They are

11    the ones that created the art, because she said, "Cris, I got

12    it, Uncle."

13         The only thing my role is I own the business, I

14    package.  Our only goal, if you ask me, this person, I said, "I

15    don't know what to say, I don't know.  I'm a Filipino."  We

16    started selling the stone art as made in the Philippines, sir,

17    then they are the ones -- I tell them, "Stop, no, no."  Every

18    time I go to the floor, anything, they kick me out, they put me

19    to the back, because they are the ones running the business,

20    the Natives, the Tlingits, they are from Prince of Wales.  They

21    are the ones that created all of this.  They have their own

22    dialect, sir.

23         So I loved them, sir.  One of them robbed a bank.

24    They do anything crazy.  I just don't want them to go to that

25    direction, sir.  That's why all those years, they get

1   20 percent of the sales.

2          I apologize, sir.  I apologize to the Natives.  I

3   apologize to everyone, people that pay for the art, sir.  I'm

4   sorry.  I won't do this again in my life.

5          THE COURT:  All right.  Thank you.

6          All right.  Taking into consideration the factors

7   identified in 18 United States Code Section 3553(a), the first

8   factor that I think is important are the nature and

9   circumstances of the offense, which has to do with really three

10  businesses as I can tell.  There is the two stores, one that

11  specialized in totem poles, another that specialized in

12  carvings, stone carvings, and then there was the business.

13         It sounds to me like it was the defendant, but his

14  wife was the principal of the operations in the Philippines,

15  which created all of this.  I mean, I think the defendant is

16  still minimizing his conduct in this case, to be honest with

17  you.  I think that he's trying to absolve himself of any

18  responsibility for the totem poles when in fact they were

19  having totem poles made in the Philippines and shipped to

20  Alaska to sell.

21         The next factor is the history and characteristics of

22  the defendant.  Again, as has been noted, he has no criminal

23  history.

24         To reflect the seriousness of the offense, I think

25  that is one of the most important things in this case.  This

was a complete and utter cultural appropriation of Native

Alaskan culture, for lack of a better way of describing it.

It wasn't just that they were appropriating the art of

Native Alaskans; they were lying to their customers, they were

holding themselves out as Native Alaskans, as a Native Alaskan

family, this was all artwork done by this family of Native

Alaskans.

And so not only -- your crime affects the Native

Alaskan culture, the art done by that community, legitimate

Native Alaskan artists who are trying to preserve their culture

and make a living, the other businesses in Ketchikan that were

legitimately selling Alaska Native art, because you were

undercutting them by selling the stuff you got for very little

made over in the Philippines and representing it to be Alaska

Native art.

And as pointed out today, the impact of your crime

isn't a snapshot in time of the five-year period we're talking

about, 2016 to 2021, it has a generational impact.  The ripple

effects of this are going to continue for years.

And so for once, at least in recent memory,

Mr. Schmidt and I agree on the concept of general deterrence.

I'm not a big believer in many crimes of general deterrence.

This case is an exception.  I think this case cries out general

deterrence, that individuals who would consider engaging in

this type of conduct know there are consequences for that and

1    those consequences include serving a period of time in prison.

2            And not only has your crime impacted the Alaska Native

3    cultures, but it's impacted your own family, because you're not

4    going to be with your family because you're going to be in

5    jail, not the least of which I find deeply troubling is the

6    fact that you brought your young son into this crime and made

7    him a part of this crime for which he now has -- he's going to

8    be facing the consequences.

9            You know, one of the things that the PSR points out

10   are the, at paragraph 9, Docket 53, are the sort of average

11   sentences for this type of crime, which is the 18 months that

12   you all had proposed to me as a sentence in this case, but this

13   goes beyond that.  Those are for white collar crimes that don't

14   have an impact on the culture of a people, in this case, Alaska

15   Natives, which is, again, something that is very difficult to

16   measure, but has a profound impact on them, and I don't think

17   that's taken into consideration by that 18 months.

18           So I just want to make sure, have you had a chance to

19   look at the four special conditions?  And actually, we're going

20   to need to modify that, because I'm not going to impose a fine,

21   but in paragraph 3 of the special conditions, Docket 53, page

22   3, paragraph 3 is actually going to be now $60,000 to the --

23   can you give me the name?

24           MR. SCHMIDT:  Tlingit and Haida Central Council

25   Vocational Program.

1    THE COURT:  Okay.  So with that adjustment, have you

2  had a chance to look at the four other listed special

3  conditions and any objection to those?

4    MR. BARSHIS:  No, Your Honor.

5    THE COURT:  I'm going to impose those four special

6  conditions.

7    Did you have a request as far as placement is

8  concerned?

9    MR. BARSHIS:  We do, Your Honor, we would ask for

10  Sheridan.

11    THE COURT:  All right.

12    Pursuant to the Sentencing Reform Act of 1984 and

13  considering the factors found in 18 United States Code Section

14  3553(a), it is the judgment of Court that the defendant,

15  Cristobal Magno Rodrigo, is hereby committed to the custody of

16  the Bureau of Prisons to be imprisoned for a term of 24 months.

17    Upon release from imprisonment, the defendant shall be

18  placed on supervised release for a term of three years.

19    Within 72 hours of release from the custody of the

20  Bureau of Prisons, the defendant shall report in person to the

21  probation office in the district to which the defendant is

22  released.  While on supervised release, the defendant shall not

23  commit another federal, state or local crime, shall not possess

24  a firearm or illegal controlled substance, shall comply with

25  the collection of a DNA sample, and shall comply with the

1  standard and special conditions that are included in the

2  judgment issued by the Court.

3       The mandatory condition of supervised release set

4  forth in 18 United States Code Section 3563(a)(5) requiring the

5  defendant to submit to drug testing is suspended as it appears

6  that the defendant is a low risk to future substance abuse.

7       The Court finds the defendant does not have the

8  ability to pay a fine.  I am actually going to order -- it

9  seems to me that the appropriate way to phrase this is there is

10 an order of $56,204.81 [sic] in restitution to some individual

11 customers that purchased artwork from the defendant.  And that

12 in addition, there is the $60,000 donation to the Tlingit and

13 Haida Central Council Vocational Program.

14       Let's see.  It is further ordered that the defendant

15 shall -- no fine is being imposed.  That obviates the rest of

16 that.

17       So let me just turn to probation.  Does that take care

18 of it if I add that $60,000 as restitution?  I mean, it's not a

19 fine.

20       PROBATION OFFICER:  Yes, Your Honor, that would be

21 fine.  I would just need a list of the payees for the judgment.

22       THE COURT:  That is actually attached to the plea

23 agreement if I'm not mistaken.

24       The payees, isn't that part of the plea agreement?

25 There is a whole long list.

1            MR. SCHMIDT:  Yes.

2            PROBATION OFFICER:  Thank you, Your Honor.

3            THE COURT:  If you look at the plea agreement, there

4     is a list of individual customers who have requested

5     restitution, which is where the total amount of $56,204.81

6     [sic] comes in, plus the additional $60,000 to the Tlingit and

7     Haida Vocational Program.

8            Were there any charges to dismiss?

9            MR. SCHMIDT:  No, Your Honor.

10           THE COURT:  Was there a waiver of appeal rights in

11    this case?

12           MR. SCHMIDT:  Yes, sir.

13           THE COURT:  So, sir, as part of your plea agreement in

14    this case, you agreed to give up your right to appeal if I

15    sentence you in a way that's consistent with your plea

16    agreement, which I have now done.

17           Nevertheless, if you think there is a basis for an

18    appeal, you have 14 days from today to file your notice of

19    appeal.

20           It take it, Mr. Schmidt, you are not going to object

21    to him self-reporting once he is designated?

22           MR. SCHMIDT:  That's correct.

23           THE COURT:  What's going to happen is the Bureau of

24    Prisons is going to contact the probation office and let them

25    know when and where you have to report.  I am going to strongly

1  request that you be considered for placement in Sheridan,

2  Oregon to permit family visitation during your period of

3  incarceration.

4  I'm also going to strongly request that you be

5  considered for placement in a halfway house as early as

6  possible, and they usually do that, I don't know, six months

7  out or so, so they will transition you into a halfway house.

8  Let me ask the government, is there anything else you

9  think I have missed?

10  MR. SCHMIDT:  No, Your Honor.

11  THE COURT:  Defense?

12  MR. BARSHIS:  Your Honor, I would just ask would the

13  Court be willing to consider strongly recommending electronic

14  home detention as early as possible?

15  THE COURT:  Yes, I will strongly request electronic

16  monitoring and home detention.  And BOP may look at that as an

17  option rather than a halfway house, so, yes, I will make that

18  recommendation.

19  MR. BARSHIS:  Thank you.

20  DEPUTY CLERK:  Your Honor, was there a special

21  assessment?

22  THE COURT:  Yes, there is, $200, $100 for each count.

23  I think that covers everything, unless I've missed something.

24  MR. SCHMIDT:  That's correct.

25  MR. BARSHIS:  Correct.

1          THE COURT:  So, again, if you can make sure your

2   client understands they will give him a date and time he has to

3   report.  Okay.

4          If there is nothing else, then we will be in a brief

5   recess so we can transition to the next hearing.

6          DEPUTY CLERK:  All rise.  This matter is adjourned.

7   This court now stands in recess for the next matter on our

8   calendar.

9       (Proceedings concluded at 10:15 a.m.)

10

11                          CERTIFICATE

12      I, Sonja L. Reeves, Federal Official Court Reporter in and
    for the United States District Court of the District of Alaska,
13  do hereby certify that the foregoing transcript is a true and
    accurate transcript from the original stenographic record in
14  the above-entitled matter and that the transcript page format
    is in conformance with the regulations of the Judicial
15  Conference of the United States.

16      Dated this 30th day of August, 2023.

17

18                      /s/ Sonja L. Reeves
                        SONJA L. REEVES, RDR-CRR
19                      FEDERAL OFFICIAL COURT REPORTER

20

21

22

23

24

25